FILED
08/07/2020
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 1, 2020

## IN RE B.M., ET AL.

### Appeal from the Circuit Court for Jefferson County
### No. 25411-IV        O. Duane Slone, Judge

_____

### No. E2019-02013-COA-R3-JV

_____

This case involves alleged child abuse by the mother's paramour.  After receiving a referral for potential child abuse, the Department of Children's Services filed a dependency and neglect petition seeking injunctive relief, an *ex parte* order, and to transfer temporary legal custody of two minor children.  After a hearing on the petition, the juvenile court found that the paramour committed severe child abuse.  The paramour appealed to the circuit court.  The circuit court also found there was clear and convincing evidence to show the paramour committed severe child abuse and that the abused child was dependent and neglected.  We affirm the circuit court's findings and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Daniel Hellman, Knoxville, Tennessee, for the appellant, Sean O.[1]

Herbert H. Slatery III, Attorney General and Reporter; Erica M. Haber, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## MEMORANDUM OPINION[2]

---

[1] In actions that involve minors, the policy of this Court is to protect the privacy of children by only using the first name and last initial, and in some cases just the initials, of the parties involved.  *In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

[2] Rule 10 of the Rules of the Court of Appeals provides as follows:

# I.    FACTS & PROCEDURAL HISTORY

B.M. is a minor child who was born in early 2014.  On August 1, 2016, the Tennessee Department of Children's Services ("DCS") received a referral on potential abuse against two-year-old B.M.  After receiving the referral, Kayla Gillespie—a Child Protective Services Investigator at DCS ("CPSI Gillespie")—notified law enforcement.  Shortly thereafter, CPSI Gillespie, Detective Pam Taylor of the Jefferson County Sherriff's Office, and a local police officer went to the child's residence to conduct an in-home investigation.

Upon arriving for the in-home investigation, CPSI Gillespie immediately noticed several bruises on B.M.'s neck, face, thighs, and shoulders.  B.M.'s mother, Leanda A.J. ("Mother"), initially stated that B.M. bruised his face by falling off of a toy car.  Later, she stated that he woke up with the marks on his face after a nap.  When CPSI Gillespie commented that these explanations did not account for the injuries, Mother gave a third explanation.  She stated that she first noticed the bruises on his face after picking him up from a babysitter.  After the in-home investigation was concluded, B.M. was admitted to the East Tennessee Children's Hospital for a physical examination of his injuries.  Sean O. ("Sean") (appellant and Mother's now-ex-fiancé) was not present for the in-home investigation.

At the hospital, Dr. Colleen Costello, a pediatric emergency medicine physician, examined B.M.  Dr. Costello determined that B.M. had several bruises on his scalp, face, ears, and thigh; areas of petechiae[3] on his face, scalp, neck, buttocks, and extremities; and multiple abrasions near his left eye and lower lip.  Dr. Costello diagnosed B.M. with multiple bruises, traumatic petechiae, and alleged physical abuse.  B.M. spent one night in the hospital before being placed in the custody of his maternal grandmother.  B.M. has remained in the custody of his grandmother since leaving the hospital.  Mother's second child, J.J., was also placed in the custody of extended family members.[4]

---

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value.  When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[3] "Petechiae are round spots that appear on the skin as a result of bleeding under the skin."  Nicole Verdi, *Releasing the Stranglehold on Domestic Violence Victims: Implications and Effects of Rhode Island's Domestic Assault Strangulation Statute*, 18 Roger Williams U. L. Rev. 255, 266 n.76 (2013).  Dr. Costello stated that petechiae is often caused by a direct impact to the skin or by an increase of pressure near the area, such as choking.

[4] Sean is the biological father of J.J.

Mother was also questioned about B.M.'s injuries by Detective Taylor at the Sheriff's Office. Initially, she maintained that B.M. suffered the injuries by falling off of a toy car. Then, she stated that one day while B.M. was napping, she saw Sean's brother enter the room, heard B.M. whimper, and when B.M. came out of the room, he had bruises. Later, she gave another explanation of B.M. being left home alone with Sean while she went to Walmart. She stated that when she returned from Walmart, she noticed the injuries to B.M.'s face. At the end of her questioning, she indicated for the first time that she believed Sean caused B.M.'s injuries. Mother's inconsistencies continued when she spoke with CPSI Gillespie at the hospital.

At the hospital, Mother told CPSI Gillespie about the incident when she returned from Walmart to find B.M. with red marks on his face. While Mother was at Walmart, Sean was the only person home with B.M. When Mother saw B.M.'s injuries, she stated that she initially "freaked out" but then "just let it go" when Sean denied knowing what caused the injuries. CPSI Gillespie testified that Mother also stated "that neither [herself], nor Sean, would ever harm [B.M.]," and "if [B.M.] did get a spanking . . . it was never anything harsh." However, Mother also testified that on at least one prior occasion Sean used a belt to spank B.M.

Sean also gave inconsistent explanations for B.M.'s injuries. When he initially spoke with Detective Taylor, Sean denied that he caused any of the injuries. Then, he described one instance when he was holding B.M.'s arm as he went to spank him, and when B.M. "jerked away," he fell and hit his head on his bed. At the hearing before the circuit court, Sean confirmed the incident when he was home alone with B.M. while Mother was at Walmart, but he gave no explanation for B.M.'s injuries. He also testified that he would occasionally discipline B.M. by giving him "a pop on the bottom." As a result of Detective Taylor's investigation, Sean was charged with child abuse and neglect.

On August 5, 2016, DCS filed a dependency and neglect petition with the Juvenile Court of Jefferson County seeking injunctive relief, an *ex parte* order, and to transfer temporary legal custody of B.M. and J.J. In the petition, DCS asserted that B.M. was severely abused, as defined by Tennessee Code Annotated section 37-1-102(b)(21), and that, as a result of the abuse, B.M. and J.J. were dependent and neglected under section 37-1-102(b)(1) and (12).[5] The juvenile court found that there was probable cause to find the children dependent and neglected. The juvenile court entered an *ex parte* custody and

---

[5] It appears that DCS intended to cite section 37-1-102(b)(22), instead of (21), for the alleged severe abuse and section 37-1-102(b)(13), instead of (12), for the alleged dependency and neglect. This section of the code has undergone several revisions in recent history. When DCS filed its petition, the definition of "dependent and neglected" was listed in subsection (13), and "severe child abuse" was listed in subsection (22). *See* Tenn. Code Ann. § 37-1-102(b)(13), (22) (2016).

restraining order that granted temporary custody of B.M. to his maternal grandparents and temporary custody of J.J. to his paternal great-grandparents. Mother and Sean were ordered to have no contact with B.M., and only Mother was granted supervised visitation with J.J.

In preparation for an adjudicatory hearing before the juvenile court, Dr. Costello was deposed. In her deposition, Dr. Costello testified that abnormal injuries for children four years and younger include injuries to the torso, ears, neck, and buttocks. She stated that injuries to these areas of young children are particularly concerning because they are not typically caused by normal activity. She explained that unlike bony areas of the body (such as knees, shins, and elbows), it is difficult for young children to injure themselves on the neck, ears, abdomen, and back; and when these areas are injured, physical abuse becomes a concern. When asked about other "red flags" for nonaccidental trauma, Dr. Costello listed: whether the child has a history of injuries; whether the injury is "developmentally appropriate" for the child; whether the child has injuries of differing ages or in different stages of healing; whether the child has a common pattern of injuries; and whether the injuries are inconsistent with what the caregiver states occurred. In reference to her evaluation of B.M., Dr. Costello stated she was primarily concerned with the number of bruises on his body; the injuries being located in abnormal places; the bruises being in varying stages of healing, which indicated multiple occurrences of abuse; and several of the bruises having linear or pattern-like marks, which indicated an object was used to create contact. While Dr. Costello stated some of the injuries could have been caused by B.M. himself or by a trip and fall accident, many of the injuries were likely nonaccidental. In her opinion, B.M. was physically abused on multiple occasions and suffered nonaccidental trauma. During her examination of B.M. on August 1, 2016, Dr. Costello took 30 photographs of his injuries. All 30 photographs were included as exhibits to her deposition.

On January 26, 2018, an adjudicatory hearing was held before the Juvenile Court of Jefferson County. Mother attended in-person, and Sean attended by telephone. At the outset of the hearing, the parties agreed that Dr. Costello's deposition (including its numerous exhibits) would be admitted into evidence. Detective Taylor, CPSI Gillespie, B.M.'s former babysitter, and Mother testified. Mother testified that she gave several inconsistent stories regarding B.M.'s injuries "[b]ecause [she] was scared." She confirmed that she and B.M. lived with Sean prior to B.M.'s change of custody and that Sean watched B.M. on weekends. The child's babysitter testified that when she asked Mother about the injury to B.M.'s buttocks that "looked like a belt mark," Mother simply stated that "Sean had whopped him too hard, and [that] she was handling it."

At the close of the hearing, the juvenile court found that there was clear and convincing evidence to show that Sean abused B.M. on multiple occasions and that the abuse was aided by Mother's failure to protect B.M. The court took special note of Mother's lack of credibility due to her inconsistent stories and claimed lack of knowledge

- 4 -

regarding the injuries. The court ordered the children to remain in their current living situations, Mother to have supervised visitation with both children, and Sean to have no contact with either child. Sean appealed the finding of severe abuse to the Jefferson County Circuit Court. In the juvenile court's order, which incorporated its findings of fact and conclusions of law, it did not make a finding on whether B.M. or J.J. was dependent or neglected.

On February 21, 2019, a *de novo* hearing was held before the circuit court. Sean participated by telephone. The parties stipulated that three exhibits would be entered into evidence: (1) the transcript of the juvenile court proceeding; (2) a certified copy of Sean's prior sentencing order on unrelated crimes; and (3) a transcript of Dr. Costello's deposition and the accompanying exhibits. Sean was the only witness to testify at this hearing. He admitted that he previously lived with Mother and B.M., that there were instances where he was left alone with B.M., and that there were instances where he disciplined B.M. by giving him "a pop on the bottom." However, Sean denied knowing how B.M. received his bruises.

The circuit court found there was clear and convincing evidence of child abuse committed by Sean against B.M. that was likely to cause severe injury and that Mother knowingly failed to protect B.M. from the abuse. The court also found B.M. and J.J. to be dependent and neglected due to Sean's abuse and Mother's failure to protect B.M. As a result, the court found it was in the best interest of the children for them to remain in the custody of their extended family and for Mother to have supervised visitation. The court affirmed the decision to bar Sean from having contact with either child. On October 28, 2019, the circuit court entered its final written judgment. Sean timely appealed the circuit court's finding that B.M. suffered severe abuse and that B.M. was dependent and neglected.[6]

## II.    ISSUES PRESENTED

Sean presents two issues on appeal, which we have reworded:

1.  Whether there is clear and convincing evidence to support the circuit court's finding that Sean committed severe child abuse against B.M.; and

2.  If so, whether there is clear and convincing evidence to show that B.M. was dependent and neglected as a result of the abuse by Sean.

For the reasons stated herein, the decisions of the circuit court are affirmed and remanded.

---

[6] It appears that Sean only appeals the circuit court's findings that relate to B.M.

### III. STANDARD OF REVIEW

"Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence is a question of law, which we review *de novo* with no presumption of correctness." *In re Melanie T.*, 352 S.W.3d 687, 695 (Tenn. Ct. App. 2011). *See also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). The trial court's factual findings, including those made in support of this ultimate issue, are reviewed *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Melanie T.*, 352 S.W.3d at 695–96; *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009).

### IV. DISCUSSION

Sean challenges the circuit court's finding that he committed severe child abuse against B.M. and that B.M. was dependent and neglected as a result of the abuse. In doing so, Sean takes issue with the court identifying him, rather than another alleged perpetrator, as a party that abused B.M. He also questions whether there was clear and convincing evidence to support the trial court's findings.

"Severe child abuse" includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death."[7] Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (2016).[8] "'Serious bodily injury to [a] child' includes, . . . fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, . . . *injuries to the skin that involve severe bruising* or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(c) (2016) (emphasis added). A child may be found to be "dependent and neglected" if he or she is suffering from abuse or neglect. Tenn. Code Ann. § 37-1-102(b)(13)(G) (2016). In dependency and neglect actions, clear and convincing evidence is required for a court to find that severe child abuse has occurred and that a child is dependent and neglected. *In re S.J.*, 387 S.W.3d 576, 587 (Tenn. Ct. App. 2012); *In re Melanie T.*, 352 S.W.3d at 695; *In re Samaria S.*, 347 S.W.3d at 200.

---

[7] In its brief, DCS concedes that the circuit court did not base its decision on subsection (B) of section 37-1-102(b)(22) (2016). Therefore, we shall only discuss the definition of "severe child abuse" listed in subsection (A).

[8] Currently, "severe child abuse" is defined under section 37-1-102(b)(27), and its internal reference to the definition of "serious bodily injury" has changed from section 39-15-402(d) to section 39-15-402(c). *See id.* § 37-1-102(b)(27)(A) (2019). The relevant portions of the statute (and others cited in this opinion) remain the same as they did when DCS filed its petition in August 2016.

Previously, this Court has discussed the clear and convincing standard in dependency and neglect proceedings:

> For evidence to meet the clear and convincing standard, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. Clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not.

*In re Samaria S.*, 347 S.W.3d at 200 (citations omitted) (quoting *In re Isaiah L.*, 340 S.W.3d 692, 705 (Tenn. Ct. App. 2010)). Additionally, on appeal, "[w]hether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to *de novo* review with no presumption of correctness." *Id.* (citing *Cornelius v. State, Dept. of Children's Servs.*, 314 S.W.3d 902, 906–07 (Tenn. Ct. App. 2009)). "Each specific underlying fact need only be established by a preponderance of the evidence." *In re S.J.*, 387 S.W.3d at 592. Once the underlying facts are established, "the court must step back to look at the combined weight of all of those facts" to determine if there is clear and convincing evidence of severe child abuse. *Id.*

Sean argues that there is not clear and convincing evidence to support the circuit court's finding that he severely abused B.M. He asserts that DCS arbitrarily selected him as the culpable party by relying on a single witness, Mother, who gave several conflicting statements. The record shows otherwise. At the hearing before the juvenile court, Detective Taylor testified that Sean admitted to spanking B.M. when B.M. "jerked away" and hit his head. The child's babysitter also testified that she was informed Sean "whopped" B.M. too hard. Before the circuit court, Sean himself admitted to being alone with B.M. on July 31, 2016, when Mother went to Walmart and returned home to find that B.M. sustained injuries. Sean also admitted that he disciplined B.M. by giving him a "pop" on the bottom. This evidence displays a pattern of unexplained incidents (or unconvincing explanations) where B.M. was alone with Sean at the time B.M. suffered many of his injuries. Taken together with Mother's testimony, the evidence supports the circuit court's conclusion that Sean severely abused B.M.

As we have previously explained, child abuse cases frequently present a "confluence of circumstances" where the only witnesses of the abuse are the parents or caregivers who committed the abuse themselves. *Id.* at 591–92. *In re S.J.*, this court was presented with a similar pattern of unexplained injuries. In that case, we stated "[t]he 'knowing' element [of severe child abuse] can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver." *Id.*

at 592. In the present case, there is ample evidence that places B.M. under the care or control of Sean when he sustained his injuries. Additionally, at her deposition, Dr. Costello testified that many of B.M.'s injuries were not caused by accidents, such as dropping B.M. or B.M. tripping over a toy. For these reasons, the "confluence of circumstances" supports a finding that identifies Sean as a party that severely abused B.M. *Id.* at 591. As indicated in its final order, the Circuit Court clearly relied on the testimony of several parties to identify Sean as a culpable party.

Sean also argues that the evidence does not support a finding that B.M. suffered "severe child abuse." Again, DCS concedes that the circuit court did not base its finding on the definition of "severe child abuse" that requires the opinion of a qualified expert. *See* Tennessee Code Ann. § 37-1-102(b)(22)(B) (2016). However, the record clearly shows that B.M. suffered "severe child abuse" under subsection (b)(22)(A).

Expert testimony is not required to find "severe child abuse" under Tennessee Code Annotated section 37-1-102(b)(27)(A) (2019) (previously section 37-1-102(b)(22)(A)). *In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *4–5 (Tenn. Ct. App. Aug. 31, 2017). Severe bruising, lacerations, or other marks on a child may constitute serious bodily injury, especially when an instrument is used to inflict the injury. *See* Tenn. Code Ann. § 39-15-402(c) (2019); *In re Tamera W.*, 515 S.W.3d 860, 874 (Tenn. Ct. App. 2016); *In re Devonta L.C.*, No. E2012-00678-COA-R3-PT, 2013 WL 395977, at *12 (Tenn. Ct. App. Jan. 31, 2013). CPSI Gillespie, the babysitter, and Dr. Costello all testified that B.M. had severe bruising and petechiae on various parts of his body, including his thighs, stomach, face, neck, ears, buttocks, and scalp. The photograph exhibits to Dr. Costello's deposition clearly depict these injuries. Dr. Costello testified that she was concerned with the abnormal location of the injuries, their various stages of healing, and many of their pattern-like shapes, which indicate an object was used to make impact. Dr. Costello's conclusion was that B.M.'s injuries were nonaccidental and that B.M. was abused on a regular basis.

The testimonies of CPSI Gillespie, Detective Taylor, Mother, the babysitter, and Dr. Costello and the pictures of B.M.'s injuries show by clear and convincing evidence that B.M. suffered nonaccidental injuries on multiple occasions, some of which included the use of an object.[9] As a result, we affirm the circuit court's finding that B.M. suffered "severe child abuse" under Tennessee Code Annotated section 37-1-102(b)(22)(A) (2016).[10]

---

[9] We give great deference to the circuit court's determination that Sean's testimony was inconsistent and incredible due to him denying that he knew the source of B.M.'s injuries. *See, e.g.*, *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *In re Samaria S.*, 347 S.W.3d at 200 (stating "[f]indings of fact based on witness credibility are given great deference").

[10] Sean also asserts that there were "more specialized" doctors than Dr. Costello to determine whether B.M.'s injuries were the result of nonaccidental trauma. This argument is unpersuasive. The

In this appeal, Sean also appears to take issue with the circuit court's finding that B.M. was dependent and neglected as a result of the severe child abuse inflicted upon him. The General Assembly made clear that a "dependent and neglected" child includes one that "is suffering from abuse." Tenn. Code Ann. § 37-1-102(b)(13)(G) (2016). *See also In re H.L.F.*, 297 S.W.3d at 235. Further, a child may be found to be "dependent and neglected" even when the abuse is the result of excessive discipline. *In re Tamera W.*, 515 S.W.3d at 872–73. Having affirmed the circuit court's finding that B.M. was the victim of severe child abuse by Sean, we also affirm the finding that B.M. was dependent and neglected as result of that abuse.

## V.    CONCLUSION

The circuit court's decisions are affirmed and remanded for further proceedings as may be necessary. Costs of this appeal are taxed to appellant, Sean O., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

circuit court specifically found Dr. Costello to be an expert in emergency pediatrics with significant qualifications that enable her to testify on such matters.