IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2020

**IN RE A.V.N.**

**Appeal from the Juvenile Court for Sevier County**
**No. 19-000466     Jeffrey D. Rader, Judge**

_____

**No. E2020-00161-COA-R3-PT**

_____

This case involves a petition to terminate the parental rights of a mother and father. The petitioners alleged four grounds for termination against both parents: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to parent. The trial court found all four grounds were proven by clear and convincing evidence. The trial court also found that it was in the best interest of the child to terminate both of the parents' rights. The mother and father appealed separately. We reverse in part, affirm in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in part, Affirmed in part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KRISTI M. DAVIS, J., joined.

Robert L. Huddleston, Maryville, Tennessee, for the appellant, Jeffrey V.N.[1]

Elizabeth A. Brady, Johnson City, Tennessee, for the appellant, Asyia V.N.

Gregory E. Bennett, Seymour, Tennessee, for the appellees, Ethan H. and Madison H.

**OPINION**

**I.     FACTS & PROCEDURAL HISTORY**

_____

[1] In actions involving a juvenile, it is this Court's policy to protect the privacy of the child by using only the first name and last initial, or only the initials, of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

A.V.N., who was born in December 2015, is the daughter of Jeffrey V.N. ("Father") and Asyia V.N. ("Mother") (collectively "Parents"). Currently, A.V.N. resides with her maternal uncle, Ethan H., and his wife, Madison H. (collectively "Petitioners"), who filed a petition to terminate Parents' rights to A.V.N. After the juvenile court granted the petition, Parents separately appealed the ruling.

In March 2017, the Department of Children's Services ("DCS") received a referral alleging that Parents were exposing A.V.N. to illegal drugs. DCS investigated the referral and Parents agreed to submit to a drug screen. Mother tested positive for Oxycodone and THC, which she admitted to using on a regular basis, and Father also tested positive for THC and Oxycodone. Later, DCS filed a "Petition for Order Controlling Conduct" with the Juvenile Court for Sevier County. Thereafter, the juvenile court entered an order controlling Parents' conduct, requiring them to complete certain tasks. On June 22, 2017, the guardian ad litem for A.V.N. filed an emergency petition for dependency and neglect and an immediate change of custody, asking the court to place A.V.N. in the custody of her maternal grandmother and step-grandfather. The juvenile court granted the petition and entered an order transferring custody of A.V.N. to her maternal grandmother and step-grandfather. After a preliminary hearing on June 26, 2017, the court ordered that temporary legal and physical custody of one-year-old A.V.N. would be granted to Petitioners.[2] The court also granted Parents supervised visitation so long as they were not incarcerated.

At an adjudicatory hearing on August 23, 2017, Mother stipulated that her substance abuse caused A.V.N. to be dependent and neglected. Father also stipulated that A.V.N. was dependent and neglected due to his substance abuse and domestic violence issues. As a result, the juvenile court found there was clear and convincing evidence to show that A.V.N. was dependent and neglected.

On November 1, 2017, the juvenile court held a final dispositional hearing on the petition filed by DCS and the motion filed by the guardian ad litem. In its written order, the juvenile court found that Mother and Father had a "very dysfunctional relationship," which Mother did not recognize as dysfunctional. In an effort to maintain stability for A.V.N., the court granted Mother four hours per week of supervised visitation. Father was also granted supervised visitation. The court required Mother to complete certain tasks before it would modify its visitation order. Mother was required to complete a full psychological evaluation, complete an intensive outpatient rehabilitation program, submit to random drug screens, and obtain stable housing. On July 10, 2018, the juvenile court entered an order that closed the dependency and neglect case.

---

[2] Petitioners took custody of A.V.N. in large part due to the ongoing contentious relationship between Mother and the maternal grandmother. Occasionally, disagreements between Mother and the grandmother resulted in violent confrontations. Mother's relationship with the grandmother continued to be combative throughout this case.

On April 9, 2019, nearly two years after A.V.N. was removed from Parents' custody, Petitioners initiated the instant case by filing a petition to terminate Parents' parental rights. Petitioners alleged four grounds against both parents for termination of parental rights: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to parent. With their petition, Petitioners also filed a motion to limit Parents' visitation. In support of their motion, Petitioners claimed that Parents had demonstrated hostility and violence at past visitations and that they were concerned that Parents would retaliate negatively in response to their petition. The juvenile court granted the motion and entered an ex-parte order that required all visitation to be supervised and take place at a third-party agency, Parent Place. However, neither parent ever exercised visitations at Parent Place. A final hearing on the petition occurred on January 9, 2020.

At the final hearing, Father testified to his criminal history and past drug use. Father's previous criminal convictions are extensive and often stemmed from violent exchanges with Mother. Since 2017, Father has pled guilty to multiple counts of domestic assault committed against Mother. His most recent assault occurred in September 2019. Father has also pled guilty to violating a court's bond restriction, violating a restraining order and bond restriction by contacting Mother, and filing a false police report. Additionally, on three separate occasions, Father pled guilty to public intoxication. His most recent public intoxication conviction occurred in April 2019 after he was found walking along the side of a road in the rain with no shirt and pants near his ankles. After being arrested and taken into custody, Father stated he was under the influence of alcohol, marijuana, and meth. As a result of his criminal convictions, Father was incarcerated for the majority of 2018. While testifying in this case, Father admitted that he was a drug addict, with alcohol being his "drug of choice." He admitted to last using a "substance" on December 21, 2019. On December 23, 2019, Father was voluntarily admitted into a long-term rehabilitation program where he remained at the time of the final hearing on January 9.

Father also testified regarding his relationships with Mother and A.V.N. As a result of Parents' use of drugs and alcohol, Father stated that his relationship with Mother was toxic and often violent. In regards to his visitations with A.V.N., he commended Ethan for being fair and accommodating. His visitations usually took place at a fast food restaurant and were supervised by Ethan. However, Father could not recall how many times he visited with A.V.N. in the months preceding the petition's filing. Since A.V.N. was removed from his and Mother's custody, Father has held a variety of jobs at different fast food restaurants. Despite these positions, Father did not provide any financial support to Petitioners in the four months before they filed the petition. Father admitted that he currently has no home or ability to care for A.V.N. and that he has been persistently unavailable to her. He commended Petitioners for taking "great care of [A.V.N.]" while she has been in their custody.

During Mother's testimony, she also admitted to prior criminal convictions and drug-related issues. Mother's criminal convictions included contempt of court for violating an order granting bail, violation of pre-trial bond, and driving on a suspended license. Previously, Mother was also arrested for domestic assault against Father, but the charges were later dropped.[3] As of the final hearing, Mother had a DUI charge that she received in September 2019. Mother also testified to her history of drug use. On three prior occasions, Mother began an outpatient rehabilitation program but failed to complete each one. Since she was no longer in a rehabilitation program, Mother stated that she was doing "nothing really at this time" to remain sober. In fact, she admitted to smoking marijuana the day before trial.

When questioned about her visitations with A.V.N., Mother testified that they were positive. Mother described her supervised visitations as "great" visits. Despite her young age, Mother claimed that A.V.N. would recognize Mother, shared a bond with Mother, and would at times cry when the visitation ended. Although, Mother admitted that during one visit she became so aggravated with Ethan and with "not being able to [parent A.V.N.]" that she "flipped" over a food tray in frustration. During the four months prior to the filing of the petition, Mother claims she visited nearly every week. The only weeks that she claimed she did not visit were weeks she was incarcerated. Mother could not remember the exact dates she was incarcerated, but she estimated the two times she was incarcerated totaled between thirteen and fifteen days.[4] Mother also testified that she asked Ethan for additional visits and phone calls, but she was consistently denied.[5]

Although Mother requested additional visitations from Ethan, she did not accomplish the necessary tasks that would have allowed her additional visitation. In its 2017 dispositional order, the juvenile court listed requirements for Mother to complete before visitation would be modified. One requirement was for Mother to complete a full psychological evaluation. Mother claimed the evaluation was too expensive to complete without health insurance. At the end of 2017, Mother was allowed two visits per week, one was to be supervised by Ethan and one would take place at Parent Place. However, Mother never exercised a single visit at Parent Place, claiming she could not pay the intake

---

[3] When asked about A.V.N.'s exposure to domestic abuse by both Mother and Father, Mother dismissed the effect it may have had on A.V.N., stating she was "usually asleep" and that she did not think A.V.N. noticed it.

[4] Mother testified that between January, 2019 and April, 2019, she was incarcerated twice: one time for ten days, and another time for "three [days] . . . or five or something." From the record, it appears that Mother was incarcerated during one period from February 26, 2019 through March 5, 2019 (a total of eight days). The record is unclear as to when her second period of incarceration may have occurred.

[5] Ethan testified that he began denying Mother phone calls only after he warned her to stop acting inappropriately on the calls. On prior calls, Mother would try to discipline A.V.N. over the phone, leading to her getting visibly upset, and would promise to buy A.V.N. toys and that the family would be together soon. Ethan testified that he informed Mother she was welcome to call so long as she sought help in a rehabilitation facility.

fees.[6]  Instead of progressing to unsupervised visitations while Petitioners had custody of A.V.N., Mother's visitations regressed.

The financial support Mother provided Petitioners while A.V.N. was in their custody was hotly contested.  Mother testified that she initially provided items such as baby wipes and diapers.  She also claimed that in 2018, for A.V.N.'s birthday and Christmas, she provided a large number of gifts, including a small scooter and ten outfits.  Ethan testified that Mother did provide gifts in 2018 but that only a few gifts were dropped off; that he did not recall a scooter being included; and that the outfits, which were less than ten, were too small for A.V.N. to wear.  Aside from these gifts and small items, Mother admitted that she did not provide support for A.V.N.'s care since she has left her custody.[7]  Mother claimed she was unable to provide support during the four months prior to the petition being filed.

Mother's employment status since A.V.N. left her custody has been sporadic and uncertain.  In the past, she worked low paying jobs at a variety of fast food restaurants.  She admitted that these positions were often of short duration.  She stated that she lost jobs, in part, due to her addiction issues, short incarcerations, and lack of transportation.  As of the final hearing, Mother was without a car of her own or a valid driver's license.  Apparently, her previous car was scrapped and she was required to pay approximately $3,500 in fines before she could obtain a new driver's license.  She testified that in the summer and fall of 2018 she was unable to work due to breaking her ankle twice.  Aside from her ankle injuries, Mother had no physical disabilities that prohibited her from working.  In fact, when she was healthy and able to work, Mother stated that she "[made] pretty good money" but spent the money on buying a car or finding a place to live.  At trial, Mother stated that she was still "technically employed" at a fast food restaurant but she had not contacted them to resume working.  If she was to resume working, because she does not have transportation of her own, she would require a roommate or family member to take her to work.  Despite her claims that she resumed working just prior to trial, Mother did not provide A.V.N. with Christmas or birthday presents in 2019.

Aside from her employment, Mother obtained two sums of money in 2019 that she did not use to help support A.V.N.  First, Mother received $5,000 for her 2018 income tax return.  She claimed she used the money to obtain transportation, stable housing, and a $100 tattoo.  Next, Mother received between $5,000 and $6,000 as an insurance settlement for injuries she sustained in a car accident.  Rather than obtain a psychological evaluation, provide support, or pay the intake fees at Parent Place, Mother stated she used these sums

---

[6] At trial, a letter written by the Program Coordinator of Parent Place was admitted into evidence. The letter describes Mother's efforts to set up visitations at Parent Place, but it also lists instances where Mother missed appointments, could not be contacted, or went several months without making contact.

[7] Mother claimed that she paid forty dollars per month to store A.V.N.'s items, but those payments were not made to Petitioners, and she provided no receipts or other verification to confirm she actually made such payments.

of money to obtain a car, attempt to obtain a more stable home, and pay fees on Father's driver's license.

Mother also testified at length on her prior housing arrangements. She testified that from the time A.V.N. left her custody until January 2020, she was without a home and often stayed with friends and rented weekly residences.[8] On one occasion, she was forced to spend a night under a bridge. At trial, Mother presented a one-year lease that she entered into on January 1, 2020, just eight days earlier. She stated that the lease is for an apartment that she shares with two other gentlemen. Mother testified that all three of them smoke marijuana and one gentleman drinks heavily. While Mother claims she has the ability to pay the lease payment of $300 per month, her mother-in-law paid the initial $300. Mother agreed that it would be in A.V.N.'s best interest to remain in Petitioners' custody while she continued to improve her life. Yet, despite the instability of her life, she also stated that A.V.N. could begin living with her immediately if she was allowed to do so.

At trial, Ethan verified many of the facts to which Parents testified. Ethan testified to Mother's past drug issues, the reduction in visitation hours, and many of Mother's visitations being contentious. Ethan testified that Mother's visits got progressively worse before they were stopped because "[Mother] was more interested in arguing . . . than spending time with [A.V.N.]" While Ethan stated Father's visits were better in quality, he explained that Father's repeated incarcerations made it difficult for him to develop a meaningful relationship with A.V.N. Ethan also confirmed that he and Madison did not receive any financial support from either parent in the four months prior to them filing the petition to terminate parental rights, nor did they receive birthday or Christmas gifts in 2019.

In contrast to Parents' declining relationship with A.V.N., there was extensive testimony on the positive outcomes of A.V.N. being in Petitioners' custody. In 2018, A.V.N. began referring to Petitioners as "Mom" and "Dad" without her being prompted to do so. Ethan also stated that A.V.N. treats and refers to their biological son as "her little brother." Since coming into their custody, Petitioners testified that A.V.N. has done "wonderful[ly]" and enjoys activities such as dancing, swimming, and having tea parties. If their petition in this case is granted, Petitioners intend to adopt A.V.N. However, Ethan stated that even if the petition is granted, he will allow Parents to maintain contact with A.V.N. as long as they are seeking help for their drug and alcohol issues.

At the close of final hearing on January 9, 2020, the juvenile court rendered an oral ruling. On January 28, 2020, the court entered a final written order that included its findings of fact and conclusions of law. In its written order, the court found there was clear and convincing evidence to terminate both Parents' rights to A.V.N. on all four grounds

---

[8] Although Parents married in 2014 and apparently have not legally divorced, they have primarily lived apart since A.V.N. left their custody.

alleged: (1) abandonment by failing to visit; (2) abandonment by failing to support; (3) persistence of conditions; and (4) failing to manifest an ability and willingness to parent. The court further found that there was clear and convincing evidence that it was in the best interest of A.V.N. to terminate both Parents' rights. As a result, the court granted the petition and terminated both Mother's and Father's parental rights. Parents separately appealed.

## II.    ISSUES

While Mother and Father have proceeded through this case as separate parties, they raise the same issues as they relate to their individual parental rights. Therefore, we have combined and reworded the issues that have been raised on appeal.

1. Whether the juvenile court erred in finding Mother and Father abandoned A.V.N. by failing to visit;

2. Whether the juvenile court erred in finding Mother and Father abandoned A.V.N. by failing to provide support;

3. Whether the juvenile court erred in finding the ground of persistent conditions was proven against Mother and Father;

4. Whether the juvenile court erred in finding Mother and Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of A.V.N.; and

5. Whether the juvenile court erred in finding that termination of Mother's and Father's parental rights is in the best interest of A.V.N.

For the reasons stated herein, the decision of the juvenile court is reversed in part, affirmed in part, and remanded.

## III.    STANDARD OF REVIEW

Time and again courts have emphasized that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). *See also Troxel v. Granville*, 530 U.S. 57, 65 (2000). This is because "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). However, a parent's rights are not without limitations. *In re Carrington H.*, 483 S.W.3d at 522; *In re Audrey S.*, 182 S.W.3d at 860.

A party wishing to terminate the parental rights of another must prove two elements: (1) that there is at least one ground for termination; and (2) that terminating parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c);[9] *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). To ensure a parent's fundamental liberty interest is adequately protected, certain procedural safeguards are afforded to parents in termination cases. *In re Carrington H.*, 483 S.W.3d at 522; *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). One such safeguard is that the petitioner must prove both elements by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Dakota C.R.*, 404 S.W.3d 484, 496 (Tenn. Ct. App. 2012). As our Supreme Court has previously explained:

> Among the constitutionally mandated fundamentally fair procedures is a heightened standard of proof—clear and convincing evidence. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings. The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.

*In re Carrington H.*, 483 S.W.3d at 522 (citations and quotation marks omitted).

On appeal, findings of fact are reviewed *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Conclusions of law are also reviewed *de novo* but with no such presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524; *In re Bernard T.*, 319 S.W.3d at 597.

## IV. DISCUSSION

### A. Grounds for Termination

When a parent appeals a trial court's decision to terminate parental rights, this Court "must review the trial court's findings as to each ground for termination . . ., regardless of whether the parent challenges" each ground alleged. *In re Carrington H.*, 483 S.W.3d at 525-26. *See also In re Bentley D.*, 537 S.W.3d 907, 913 (Tenn. 2017); *In re Navada N.*, 498 S.W.3d 579, 589-90 (Tenn. Ct. App. 2016). In this case, the juvenile court found all four grounds were proven by clear and convincing evidence against both Mother and

---

[9] The relevant portions of this section of Code appear the same as when the petition was filed in January 2019.

Father.  Therefore, we shall review each ground in turn.

### 1. Abandonment – Failure to Visit and Failure to Support

Abandonment is one potential ground for termination of parental rights.  Tenn. Code Ann. §§ 36-1-102(1)(A), -113(g)(1).  Under section 36-1-102(1)(A)(i), "abandonment" occurs when a parent fails to visit or fails to provide reasonable payments in support of the child for a period of four consecutive months immediately preceding the filing of a petition to terminate parental rights.  Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re Braxton M.*, 531 S.W.3d 708, 723 (Tenn. Ct. App. 2017); *In re Jaylah W.*, 486 S.W.3d 537, 547-48 (Tenn. Ct. App. 2015).  Once a petitioner alleges a parent has abandoned a child by failing to visit or provide support, the parent may assert the absence of willfulness as an affirmative defense.  Tenn. Code Ann. § 36-1-102(1)(I).

On April 9, 2019, Petitioners filed their petition to terminate Parents' parental rights.  Therefore, for the purposes of subsection 36-1-102(1)(A)(i), the requisite four-month period in this case is from December 9, 2018 to April 8, 2019.  *See* Tenn. Code Ann. § 36-1-102(1)(A)(i).  However, after a careful review of the record, we find that subsection (i) was an improper ground for parental termination.  Due to Parents' incarcerations, subsection (iv) describes the applicable definition of abandonment in this case.

At the time the petition was filed, subsection (iv) stated that "abandonment" can occur when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been *incarcerated during all or part* of the four (4) months immediately preceding the institution of such action or proceeding, *and* either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child *for four (4) consecutive months immediately preceding such parent's or guardian's incarceration*, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2019) (emphasis added).  Subsection (iv) also stated that:

> [p]eriods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration.  Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration.  A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration

- 9 -

immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment.

*Id.*

Mother testified that she was incarcerated two times in the four months immediately preceding the filing of the petition. Only one appears to be for a period of seven days or more. That period of incarceration was from February 26, 2019 to March 5, 2019, a period of eight days. There is no evidence that Mother concealed or denied the incarceration at any time. Although she may have been confused as to the exact dates, it is obvious from her testimony that she had not forgotten the incarceration. As a result of this period of incarceration occurring during *part of* the four months immediately preceding the filing of the petition, subsection 36-1-102(1)(A)(iv), rather than subsection 36-1-102(1)(A)(i), applies to her alleged abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). In their petition, Petitioners did not include subsection (iv) as a potential ground for termination of parental rights. Additionally, Petitioners never amended their pleadings to include subsection (iv). In the absence of such a pleading, amendment or trial by implied consent, this ground cannot be considered by this Court in deciding whether to terminate Mother's parental rights.

As subsection (iv) pertains to Father, the record is unclear whether he was incarcerated for a period of at least seven consecutive days during the four months immediately preceding the filing of the petition. Father testified, and the juvenile court found, that he was incarcerated for "almost all of 2018," but it is unclear whether any of that time included December 9 to December 31, 2018. Father's subsequent testimony is similarly unclear. At various times, he testified that he was incarcerated at "some period of time in 2019;" that he did not believe he was incarcerated from January 8, 2019 to April 8, 2019;[10] and that he "[was] not really sure" whether he was incarcerated in the four months immediately preceding the filing of the petition. Father's criminal records are also inconclusive. Amongst this uncertainty, the applicable dates of Father's incarcerations cannot be shown by a preponderance of the evidence. In the absence of such evidence, this Court cannot make a finding on whether subsection (i) is the appropriate definition of abandonment for Father's actions in this case. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). The burden was on Petitioners to prove this ground for termination by clear and convincing evidence. As we explained in the preceding paragraph, Petitioners never included subsection (iv) as a potential ground for termination. Therefore, it cannot be considered when determining whether there are grounds to terminate Father's rights in this case.

---

[10] Some of the confusion is due in part to the trial attorneys occasionally referring to January 8, 2019 as the beginning of the four-month period immediately preceding the filing of the petition, rather than December 8, 2018.

- 10 -

We again emphasize that "courts must strictly comply with procedural requirements in termination of parental rights cases." *In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *6 (Tenn. Ct. App. Jan. 11, 2012) (citing *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037 (Tenn. Ct. App. June 3, 2008)). One such procedural requirement is that parents must be afforded sufficient notice of the ground being sought for termination of parental rights. *See id.* Unless the ground is tried by implied consent, if the ground is not properly pled, it cannot be considered as a potential ground for termination of parental rights. *See, e.g.*, *In re Justine J.*, No. E2019-00306-COA-R3-PT, 2019 WL 5079354, *8 (Tenn. Ct. App. Oct. 10, 2019); *In re K.N.B.*, No. E2014-00191-COA-R3-PT, 2014 WL 4908505, at *13 (Tenn. Ct. App. Sept. 30, 2014); *In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at *5 (Tenn. Ct. App. Dec. 26, 2013). Similarly, when abandonment is pled as a potential ground for termination, the petitioner must include the correct four-month period. *See In re Justine J.*, 2019 WL 5079354, at *8; *In re D.H.B.*, No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *5 (Tenn. Ct. App. Apr. 23, 2015). If an incorrect four-month period is pled, the petition is deficient as a result of the parent being left without the notice required to defend against the petition. *See In re D.H.B.*, 2015 WL 1870303, at *5 (citing *In re K.N.B.*, 2014 WL 4908505, at *13).

In this case, due to Mother's eight-day incarceration, Tennessee Code Annotated section 36-1-102(1)(A)(i) is not a proper ground for termination of her parental rights. Instead, section 36-1-102(1)(A)(iv) contained the applicable definition of abandonment. Further, Petitioners failed to establish the applicable four-month period for Father. In the absence of Petitioners pleading the applicable ground for termination and proving the relevant four-month period for each parent, the juvenile court erred in considering "abandonment" as a ground for termination of parental rights. "[A] court may terminate a parent's rights to his child based only upon the statutory ground(s) alleged in the petition because otherwise the parent would be 'disadvantage[d] in preparing a defense.'" *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, *4 (Tenn. Ct. App. Feb. 8, 2013) (quoting *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *10 (Tenn. Ct. App. Apr. 29, 2005)). Therefore, we must reverse the juvenile court's finding of abandonment by Parents due to their failure to support and failure to visit under Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1).[11]

---

[11] For the sake of brevity, we note that subsection (iv) was not tried by implied consent. *See In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014) (stating "[a] ground for termination not included in the petition can be properly found if the ground was tried by implied consent") (quoting *In re Johnny K.F.*, No. E2012-02700-COA-R3-PT, 2013 WL 4679269, at *8 (Tenn. Ct. App. Aug. 27, 2013)). Parents' incarcerations were clearly relevant to other portions of this case (such as the persistence of conditions and the best interest determination), and there is no indication that Parents understood that this ground for termination was being tried without it being pled. *See In re Eimile A.M.*, 2013 WL 6844096, at *5 (stating to try a ground by implied consent, the record must be clear that the evidence presented related to the ground "had no relevance to any other issue being presented" and the parent must fully understand the ground is

- 11 -

## 2.  Persistence of Conditions

"Persistence of conditions" is another ground to terminate parental rights. Tennessee Code Annotated section 36-1-113(g)(3)(A) states a "persistence of conditions" is present when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i)      The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A).

A parent's failure to remedy the conditions that led to a child's removal do not need to be willful to establish this ground. *In re Jaylah W.*, 486 S.W.3d at 556; *In re Dakota C.R.*, 404 S.W.3d at 499.  Similarly, "[a] parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016) (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).  Although this ground is commonly referred to as "persistence of conditions," the conditions may include both the original "conditions which led to the child's removal" and "other conditions" which in all reasonable probability would cause a child to be subjected to "further abuse and neglect."  *See In re Audrey S.*, 182 S.W.3d at 872 (citation omitted) (citing Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)).

Turning to the facts of this case, A.V.N. was removed from Parents' custody on June 22, 2017.[12]  The petition to terminate parental rights was filed on April 9, 2019.

---

being tried even though it was not pled).

[12] In its final order, the juvenile court mistakenly found that A.V.N. was removed on June 26, 2017.

Therefore, A.V.N. was clearly removed from Parents' custody for more than six months prior to the petition being filed. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). Shortly after A.V.N. was removed from their custody, Parents stipulated that she was dependent and neglected. Both Mother and Father stipulated that the finding was supported by their substance abuse issues, and Father also stipulated that the finding was supported by his domestic violence against Mother. Additionally, the juvenile court also found it was appropriate to remove the child due to Parents' inability to maintain a stable legal income or provide a suitable home for A.V.N. While Parents have taken some steps to remedy these issues, the record shows that the issues persisted up until the final hearing.

In regard to Mother, she has struggled to maintain consistent employment since A.V.N. left her custody. Whether this is due to her drug addiction or transportation issues, both of which she admitted, Mother has not been able to display a consistent ability to earn stable income. In fact, she admitted that the initial three hundred dollars of rent for her new apartment was paid by her mother-in-law and that the food in the apartment was provided by her roommates. Mother testified that once she recovered from her ankle injuries, she was able to work. Yet, she had not found a new job or returned to her previous employer because she simply "[had not] gotten back to them." We find this reason to be unavailing. Mother's inability to provide for herself and her inconsistent employment is also supported by the grandmother's testimony. At the final hearing, the grandmother testified that, despite their contentious relationship, Mother frequently asked the grandmother to provide her assistance. She stated that Mother's most recent request for help came only weeks before the hearing. Even if we assume *arguendo* that Mother has the means to remain in her current living situation, the apartment that she described presents many of the same issues that led to A.V.N.'s removal. Mother herself admitted to smoking marijuana in the apartment the day before the final hearing. She also stated that her roommates smoke marijuana and that one of them suffers from alcoholism. Her lack of suitable housing is not limited to her new lease. Until Mother entered into this lease on January 1, 2020, she was without a home of her own for over two years. Therefore, as a result of her continued drug use, inability to provide stable support for A.V.N., and an inability to provide a suitable home for A.V.N., we must conclude that the conditions that led to A.V.N. leaving Mother's custody persist.[13] Should A.V.N. be returned to Mother's custody, these conditions are likely to cause A.V.N. to suffer further neglect or harm. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

Father's actions, likewise, show a persistence of conditions that could expose A.V.N. to neglect or harm. After A.V.N. left Parents' custody, Father had numerous criminal convictions, pled guilty to two counts of domestic assault against Mother for

---

While the evidence preponderates against this finding, the error is not fatal to the court's ruling.

[13] Mother argues that the one-year lease for an apartment is sufficient evidence that she has provided a stable home. Given the circumstances of how the lease was entered into, the admitted drug use inside the apartment, the alcoholism of one of her roommates, and Mother entering into the lease only days before trial, we cannot say that the lease alone proves Mother provided adequate housing.

incidents in October 2017 and September 2019, and pled guilty to two counts of public intoxication for incidents that occurred in April 2019. Father also used a "substance" as recent as December 21, 2019 and admitted to being a drug addict. This Court commends Father for being voluntarily admitted into a rehabilitation facility. However, Father was only a few weeks into the long-term program at the date of trial, and he admitted to multiple relapses in the past. Also, in addition to his continued drug issues and repeated domestic violence charges, Father has not been able to provide stable housing or generate a sufficient income. This Court hopes that Father continues to take the necessary steps to improve his life and substance abuse issues, but currently, many of the conditions that led to A.V.N.'s removal continue to persist in Father's life. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

We must agree with the juvenile court that there is insufficient evidence to conclude that the parent's conditions will be remedied at an early date. Mother continued to use drugs as recently as the day before trial and sees no issue with sharing an apartment with other drug users. At trial, Mother had a pending DUI charge and $3,500 of unpaid fees on her driver's license. There is no indication that either issue will be resolved in the near future, and her continued lack of reliable transportation will continue to limit her ability to generate an income.[14] Parents' difficulties in maintaining employment are caused in large part by their drug and criminal issues that have remained consistent over the past several years. Taken together, we cannot say that these conditions are likely to be remedied at an early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

Pursuant to subsection (iii) in section 36-1-113(g)(3)(A), we further find that the continuation of A.V.N.'s relationship with Parents would "greatly diminish[] [A.V.N.]'s chances of early integration into a safe, stable, and permanent home." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Mother and Father both agree that Petitioners take "great" or "wonderful" care of A.V.N. Mother even admitted that currently it is in A.V.N.'s best interest to remain in their care. Likewise, Father acknowledged that removing A.V.N. from their custody may have a "tremendous impact" on her. Parents' testimony was supported by statements from the grandmother and Ethan that indicate A.V.N. is happy, well-adjusted, and properly cared for in Petitioners' home. Based on these testimonies, Petitioners have shown that furthering A.V.N.'s relationship with Parents is likely to diminish her chances of integrating into a permanent home where she is safe and well cared for. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).

As a result of the foregoing discussion, we affirm the juvenile court's finding that persistent conditions exist as a ground for termination of both parents' parental rights under Tennessee Code Annotated section 36-1-113(g)(3)(A).

---

[14] In her brief, Mother claims that having friends and roommates drive her is a sufficient "transportation plan" that evidences Mother has properly adjusted her life. Given the other facts surrounding her transportation issues, this argument is unpersuasive.

### 3. Failure to Manifest a Willingness and Ability to Parent

Tennessee Code Annotated section 36-1-113(g)(14) provides another potential ground for termination of parental rights. The Legislature added this ground in 2016, making it a relatively new addition to section 36-1-113(g). *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (Tenn. Ct. App. Oct. 29, 2018). To be successful in pleading this ground, a petitioner must satisfy two prongs by clear and convincing evidence. *Id.* (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)); *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018). First, the petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). *See also In re Colton B.*, 2018 WL 5415921, at *9; *In re Keilyn O.*, 2018 WL 3208151, at *8. Second, the petitioner must prove that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). *See also In re Colton B.*, 2018 WL 5415921, at *9; *In re Keilyn O.*, 2018 WL 3208151, at *8.

Since this ground was added to section 36-1-113(g), a split of authority has developed on the requirements of the first prong. *Compare In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018) (stating section 36-1-113(g)(14) requires the petitioner to prove the parent has not manifested a willingness or ability to assume custody), *with In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (stating that section 36-1-113(g)(14) requires a petitioner to prove "that the parent failed to manifest an ability *and* willingness to personally assume" custody or financial responsibility). However, this split of authority has no effect on a court's analysis unless the "parent manifests a willingness to assume custody and financial responsibility but is simply unable to do so." *In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *8 (Tenn. Ct. App. Oct. 23, 2019). Stated differently, this Court may uphold a termination of parental rights under this ground "where the parent has manifested neither a willingness nor an ability to assume custody and responsibility" of the child. *Id.* (citing *In re J'Khari F.*, No. M 2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019); *In re Colton B.*, 2018 WL 5415921, at *9-10). Based on the facts in this case, there is no need to address the split of authority on this ground since neither parent has manifested a willingness or ability to assume custody and financial responsibility of A.V.N.

Between A.V.N. leaving Parents' custody in June 2017 and the final hearing on January 9, 2020,—a period spanning more than 30 months—both Parents have shown a consistent unwillingness to parent A.V.N. in a suitable manner. While they claim to be taking the necessary steps to remedy many of the issues in their lives, the evidence shows a pattern of tumultuous and questionable lifestyle decisions. *See In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018)

- 15 -

(stating "[w]hen evaluating willingness, we look for more than mere words"); *In re Amynn K.*, 2018 WL 3058280, at *15 (stating a parent's "actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to [his] actual willingness to assume custody or financial responsibility for the Child").

Despite the need to provide a stable home and financial support for A.V.N., Mother has continued to use illegal drugs, incur fines of several thousand dollars, and engage in illegal acts. At the time of trial, a DUI charge was pending against her for an incident that occurred in September 2019. After years of homelessness, she entered into a lease only a few days before trial. Along with Mother's potential inability to maintain this lease, she shares the home with two other drug users, one of whom she described as "dying of alcoholism." She has provided very limited financial support since A.V.N. left her custody and provided none in the months immediately preceding trial. Due in large part to her unstable living arrangements, criminal charges, and drug issues, Mother has not maintained a stable income and was not generating one at trial. Ethan testified that on many of Mother's visits she did not focus on spending time with A.V.N. and instead argued with him. When Mother was given opportunities to increase her visitation time, she failed to take the necessary steps to follow through on those opportunities. Although she attempted to complete a rehabilitation program on three prior occasions, she testified that they were never completed and that she was doing "nothing really at this time" to "stay clean and sober."

Father's circumstances and recent decisions raise similar concerns. Since A.V.N. left his custody, Father has pled guilty to several crimes, including multiple counts of domestic assault and public intoxication. These criminal issues continued up to only a few months before the final hearing. Father also admitted to drinking alcohol, using marijuana, and using meth in the year prior to the final hearing. He stated that the last time he used a "substance" was only nineteen days before the final hearing. His drug use, criminal activity, and subsequent incarcerations have caused him to be without any assets, a place to live, or ability to provide for A.V.N. Again, this Court commends Father for taking the initiative of admitting himself into a long-term rehabilitation program prior to the final hearing. We are hopeful that he will be successful in this program and will progress into a stable and law-abiding lifestyle. However, at present, Father's actions and lifestyle have raised significant doubt as to whether he is truly willing and able to assume custody or financial responsibility of A.V.N.

Based upon these findings, we find that Petitioners have proven the first prong of this ground by clear and convincing evidence against both parents. *See* Tenn. Code Ann. § 36-1-113(g)(14); *In re Colton B.*, 2018 WL 5415921, at *9; *In re Keilyn O.*, 2018 WL 3208151, at *8.

Having found that Petitioners satisfied the first prong of section 36-1-113(g)(14), we now turn our attention to the second prong. In doing so, we conclude that placing

A.V.N. in the custody of either Mother or Father would subject her to a risk of substantial physical and psychological harm. Parents have not shown an ability to consistently provide necessities for A.V.N. Additionally, there is no indication that Parents' domestic violence issues have been resolved. In contrast, Parents each testified that they believed that Petitioners have taken good care of A.V.N. The grandmother also expressed her admiration toward Petitioners as A.V.N.'s caretakers. She stated that A.V.N. is "[d]oing wonderful," is "[]well taken care of," and is emotionally developed beyond her young age. Petitioners testified to the bond that A.V.N. now shares with them and their biological son. Father's own statement succinctly summarizes our conclusion: "[A.V.N.'s first removal] already has caused [a] tremendous impact on her life," and removing her from Petitioners' care "would cause another tremendous impact." Ethan agreed, stating that if A.V.N. left their home, she would be devastated. We agree. Therefore, we affirm the juvenile court's finding that grounds exist to terminate both Mother and Father's parental rights to A.V.N. pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

### B. Best Interest of A.V.N.

If a petitioner establishes at least one ground for termination of parental rights, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Navada N.*, 498 S.W.3d at 606 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). In making this determination, courts are instructed to consider the non-exhaustive list of factors in Tennessee Code Annotated section 36-1-113(i). *In re Navada N.*, 498 S.W.3d at 607. Those nine factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

- 17 -

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The facts of a case determine the relevancy and weight given to each factor. *In re Audrey S.*, 182 S.W.3d at 878. Courts are not required "to find the existence of each factor before" concluding that terminating parental rights is in the best interest of the child. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)). If there is a conflict between a parent's interest and the child's, the conflict should be resolved in favor of the child's perspective. *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d)); *White*, 171 S.W.3d at 194.

When viewing the facts from the perspective of A.V.N., Parents have not made a sufficient change to their conduct or circumstances. Mother argues that she has adequately adjusted her life in such a way that enables her to sufficiently care for A.V.N., indicating that the first factor weighs in her favor. However, the evidence preponderates otherwise. *See In re Kaliyah S.*, 455 S.W.3d at 555 (stating "factual findings made in connection with the best-interest analysis . . . must be proven by a preponderance of the evidence"). She continues to use illegal drugs and associate herself with other drug users; she still requires assistance in obtaining and paying for housing and other essential items; and, at trial, several of her legal issues were unresolved or pending. Father has faced similar issues. As of trial, Father did not have a stable income or adequate housing for A.V.N. Additionally, his legal troubles persisted throughout 2019; he last used a "substance" only a few weeks prior to trial; and he has been persistently unavailable to care for A.V.N. In contrast,

- 18 -

Petitioners provide A.V.N. with a safe and stable home where she is happy and cared for. As such, factor (1) weighs in favor of terminating Parents' parental rights.

Factor (2) is inapplicable to this case.

Regarding factors (3) and (4) collectively, until April 2019, Mother maintained minimal visitations when she was not incarcerated, but she has not developed a meaningful relationship with A.V.N. She did not take the necessary steps to increase her visitation time, and often used visitations as opportunities to argue with other family members supervising the visits. Mother's visits worsened over time rather than improved in quality or frequency. Even Mother admitted that during her most recent visitations A.V.N. stopped showing signs of affection or attachment towards her. While of better quality, Father's visits were infrequent and devoid of a connection with A.V.N. Factors (3) and (4) also weigh in favor of terminating Parents' parental rights.

Several parties testified that A.V.N. is doing well in Petitioners' care and that removing her from their home would likely have a negative impact on her wellbeing. They have provided A.V.N. with a safe home and nurturing family where she can thrive and be cared for. Petitioners have indicated, and the evidence supports, that they have undertaken a lifetime commitment to care for A.V.N. Factor (5) weighs in favor of terminating Parents' parental rights.

There is no indication that either parent has physically abused A.V.N. However, both parents have committed physical abuse against the other, often resulting in criminal charges. Although Parents are not currently living together, if they were to reside together again, there is no evidence to suggest that their domestic issues are resolved. In fact, Father's most recent domestic assault charge stemmed from an altercation that took place approximately four months prior to trial. Factor (6) weighs in favor of terminating Parents' parental rights.

We agree with the juvenile court that the evidence on Mother's current home is "conflicting at best." It is unclear the exact type of home she lives in and what space she shares with other people. Regardless, Mother testified that both she and her two roommates smoke marijuana in what she described as an apartment, and that they did so as recently as the night before trial. Mother also stated that one roommate drinks and is "dying of alcoholism." Such actions, especially drug use by a parent, does not create a physical environment that is healthy and safe for a child. As it pertains to Father's home, he admitted that he intends to complete the long-term inpatient rehabilitation program and cannot provide a home for A.V.N. while he does so. Therefore, factor (7) weighs in favor of terminating Parents' parental rights.

While there was some testimony in the juvenile court about Parents' mental and emotional wellbeing—particularly Mother's mental health—the evidence in the record

- 19 -

does not allow this Court to make a definitive finding on factor (8).

Lastly, Parents have provided very little financial support for A.V.N. since she left their custody. Mother stated that she initially provided small items such as baby wipes and diapers. She also claimed that she spent approximately $1,000 on storing A.V.N.'s belongings and providing birthday, Christmas, and Easter gifts. Ethan acknowledged that gifts were provided for A.V.N.'s birthday and Christmas in 2018, but he stated that there were far less gifts than Mother claimed and that several of them were outfits that were too small for A.V.N. to wear. Additionally, Mother admitted that she did not provide any gifts for A.V.N.'s birthday or Christmas in 2019, and she never provided Petitioners with any child support payment. Likewise, Father did not provide any financial support in the months immediately preceding the filing of the petition, and there is no evidence that he provided any support to Petitioners since they took custody of A.V.N. The absence of a child support order against Parents is irrelevant. "[I]t is well settled in Tennessee that every [adult] parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place." *In re Braxton M.*, 531 S.W.3d at 724 (citing Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2016)). Due to their lack of financial support, especially in the months immediately preceding trial, factor (9) weighs in favor of terminating parental rights.[15]

After applying the factors listed in Tennessee Code Annotated section 36-1-113(i), we find that there is clear and convincing evidence to show that it is in the best interest of A.V.N. to terminate both Mother's and Father's parental rights.

## V.    CONCLUSION

We reverse the juvenile court's finding of abandonment by both Parents. We affirm the finding that there is sufficient evidence to support the grounds of persistence of conditions and failure to manifest an ability and willingness to parent. Further, we affirm the finding that it is in the best interest of A.V.N. to terminate Parents' parental rights. Therefore, we affirm the decision to terminate Asyia V.N.'s and Jeffrey V.N.'s parental rights.

This case is remanded to the juvenile court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed equally to the appellants, Asyia V.N. and Jeffrey V.N., for which execution may issue, if necessary.

_____

CARMA DENNIS MCGEE, JUDGE

---

[15] There was some testimony on support provided by Father's mother (the paternal grandmother), but Mother indicated that her mother-in-law's support "was [not] necessarily on [Parents'] behalf."